IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 21-cv-0006-WJM-TPO

JOSEPH FITZGERALD, by and through his parent and next friend, LINDA FITZGERALD,

    Plaintiff,

v.

CATHOLIC HEALTH INITIATIVES COLORADO d/b/a ST. ANTHONY SUMMIT MEDICAL CENTER;
SARAH PFEIFFER, P.A.; and
XAN COURVILLE, M.D.,

    Defendants.

---

**ORDER GRANTING MOTION TO EXCLUDE
TESTIMONY OF EXPERT ROBERT JAMISON, Ph.D.**

---

Before the Court is Defendant St. Anthony Summit Medical Center's ("Summit") motion to exclude certain testimony ("Motion") of Plaintiff Joseph Fitzgerald's expert witness, Robert Jamison, Ph.D.  (ECF No. 157.)  Fitzgerald filed a response, to which Summit filed a reply.  (ECF Nos. 160, 161.)

For the following reasons, the Court grants the Motion.

**I. PERTINENT BACKGROUND**

This medical negligence lawsuit stems from injuries Fitzgerald sustained after he allegedly developed compartment syndrome in his right leg while hospitalized at Summit after a snowboarding accident in January 2019.  (ECF No. 67 ¶¶ 14–16, 52–64.)  He alleges that his treating providers, Defendants Dr. Xan Courville and P.A. Sarah Pfeiffer, failed to promptly identify and address his compartment syndrome and that this delay in

care led to avoidable, permanent nerve damage in his leg and "severe and unrelenting pain." (*Id.* ¶¶ 65–76; ECF No. 160 at 1–2.) Fitzgerald further alleges that Summit negligently failed to properly train its staff and implement policies that would have prevented his permanent injury. (ECF No. 67 ¶¶ 77–88.)

In August 2020, Fitzgerald suffered a traumatic brain injury ("TBI") after falling from the third story roof of a building. It appears to be undisputed that he was "under the influence of a self-medicating substance"—Ketamine, according to Fitzgerald's experts—when he fell. (ECF No. 160 at 3; ECF No. 160-1 at 12.) Fitzgerald filed this action in January 2021, alleging that the fall and resulting TBI were caused by his nerve injury, which was caused by Courville and Pfeiffer's delay in diagnosing and treating his compartment syndrome. (*See* ECF No. 127 at 5 ("[A]s a result of his injuries from the delay in diagnosing and treating Mr. Fitzgerald's compartment syndrome, Mr. Fitzgerald suffered a significant fall from the roof of an apartment complex.").)

In March 2025, Summit moved to exclude the following testimony of Jamison: "It is my opinion to a reasonable degree of certainty that, more likely than not, the injuries flowing from the delayed treatment of Mr. Fitzgeralds's compartment syndrome-related injuries to his leg were a cause of and a contributing factor to his fall and traumatic [sic] brain injury." (ECF No. 157 at 2.)

## II. PERTINENT PRINCIPLES

Federal Rule of Evidence 702 addresses expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not:
>
> (a) the expert's scientific, technical, or other specialized

2

>knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
>(b) the testimony is based on sufficient facts or data;
>
>(c) the testimony is the product of reliable principles and methods; and
>
>(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

"Thus, Rule 702 requires the district court to 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Bill Barrett Corp. v. YMC Royalty Co.*, 918 F.3d 760, 770 (10th Cir. 2019) (per curiam) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)).

>Under Rule 702, the court must first decide whether the proffered expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion.  *See* Fed. R. Evid. 702.  Then 'the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*.'  *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).  'Where an expert testifies based on experience, the tribunal reviews the reliability of the testimony with reference to 'the nature of the issue, the expert's particular expertise, and the subject of the testimony.'  *F & H Coatings, LLC v. Acosta*, 900 F.3d 1214, 1222 (10th Cir. 2018) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148–50, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

*Id.* at 770.

In the context of expert testimony regarding causation, the Court should consider whether such proffered testimony establishes "both general and specific causation." *Etherton v. Owners Ins. Co.*, 35 F. Supp. 3d 1360, 1366 (D. Colo. 2014) (citing *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 881 (10th Cir.2005)); *see also Neiberger v. Fed Ex Ground Package Sys., Inc.*, 566 F.3d 1184, 1190–91 (10th Cir. 2009) (a reliable methodology for determining causation that is "generally accepted in the medical

community and by the courts" involves considering "the possible recognized causes [of a condition] and eliminat[ing] those contradicted by the evidence").

"General causation" refers to whether the accident in question is, in the abstract, capable of producing the type of injury suffered. *Etherton*, 35 F. Supp. 3d at 1366.

"Specific causation" refers to whether a particular accident or substance caused the specific injury at issue. *Id.* Once a party has established general causation, differential diagnosis may be admissible to prove specific causation. *Id.* (citing *Goebel v. Denver & Rio Grande Western R. Co.*, 346 F.3d 987, 999 (10th Cir. 2003)). "'Differential diagnosis' refers to the process by which a physician 'rules in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains." *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1209 (10th Cir. 2002) (internal citations and alterations omitted). An expert need not "explicitly rule out" every possible alternative cause. *Goebel*, 346 F.3d at 999. Nevertheless, the expert must "exclude those alternative explanations that are 'obvious'" or that have been identified by the adverse party. *Thomson v. Nat'l R.R. Passenger Corp.*, 2021 WL 1169708, at *10 (D.N.M. Mar. 26, 2021) (citation omitted). Although an expert may not rely solely on temporality to establish specific causation, temporality may be used as one factor "taken into account in considering causation." *Watson v. Dillon Cos., Inc.*, 797 F.Supp.2d 1138, 1155 (D. Colo. 2011).

"A district court is not required to hold a pretrial *Daubert* hearing in order to make these determinations that Rule 702 requires."[1] *United States v. Earls*, 129 F.4th 850,

---

[1] Because the Court concludes that a *Daubert* hearing is not necessary to resolve the

4

862–63 (10th Cir. 2025); *United States v. Mathews*, 928 F.3d 968, 979 (10th Cir. 2019); *Bill Barrett*, 918 F.3d at 772; *Nacchio*, 555 F.3d at 1251, 1253–54. "[T]he manner in which the court conducts its Rule 702 analysis is left to the court's sound discretion." *United States v. Chapman*, 839 F.3d 1232, 1239 (10th Cir. 2016). Still,

> [t]he court, when faced with a party's objection, must 'adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper.' *United States v. Avitia-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012). 'This gatekeeper function requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is scientifically valid and applicable to a particular set of facts.' *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

*Bill Barrett*, 918 F.3d at 770.

### III. ANALYSIS

Summit does not move to exclude Jamison as an expert witness altogether, instead making clear that it "has no objection to [him] offering opinions regarding the treatment of Joseph Fitzgerald's chronic pain or his present condition following the fall from the third-floor building roof." (ECF No. 161 at 1.) Summit contends, rather, that Jamison is not qualified and has not employed a reliable methodology to opine on the medical cause of Fitzgerald's TBI. (*See generally* ECF No. 157.) The Court agrees.

The Court begins by observing that Jamison is a clinical psychologist. (ECF No. 157-1 at 6.) Briefly, he received a Ph.D. in psychology from the Institute of Psychiatry at the University of London; completed multiple internships in clinical psychology; completed a post-doctoral fellowship at Vanderbilt Medical Center; and has practiced at Brigham and Women's Hospital Pain Management Center for 35 years. (*See generally*

---

Motion, the Court declines Summit's invitation to hold one. (ECF No. 157 at 1.)

ECF No. 157-3.)  He is also a professor at Harvard Medical School.  (*Id.* at 2.)  It is thus beyond dispute that Jamison is well qualified to opine about chronic pain and the treatment thereof.  (ECF No. 161 at 1.)

      Notwithstanding these impressive credentials, the Court concludes that Jamison is not qualified to opine under *Daubert* on the *medical cause* of Fitzgerald's TBI.  Specifically, he is not qualified to provide expert testimony that "Fitzgeralds's compartment syndrome-related injuries to his leg were a cause of and a contributing factor to his fall and traumatic [sic] brain injury."  (ECF No. 157 at 2.)  The cause of Fitzgerald's TBI calls for a medical opinion.  *Summers v. Missouri Pac. R.R. Sys.*, 897 F. Supp. 533, 540 (E.D. Okla. 1995), *aff'd*, 132 F.3d 599 (10th Cir. 1997) ("The question of causation is a medical issue . . . .").  But Jamison is not a medical doctor.  *See Bales v. Green*, 2018 WL 1633321, at *6 (N.D. Okla. Mar. 27, 2018) (precluding neuropsychologist from offering causation opinions on a medical issue); *see also Zellers v. NexTech Ne., LLC*, 533 F. App'x 192, 199 (4th Cir. 2013) ("However, as the district court properly held, Dr. Singer is not qualified to diagnose the cause of Ms. Zellars's alleged symptoms.  Dr. Singer is not a medical doctor."); *Summers*, 897 F. Supp. at 540 ("Likewise, the court also finds the neurophysiological evaluation of Plaintiff Summers conducted by Dr. Susan Franks, Ph.D., should be excluded because Dr. Franks, a psychologist, is not an expert in the field of medicine or toxicology."); *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 200 (5th Cir. 2016) ("In the absence of expertise in an ancillary field, however, we have held a non-physician is not qualified to give medical testimony."); *Edmonds v. Ill. Cent. Gulf R.R.*, 910 F.2d 1284, 1286–87 (5th Cir.1990) (concluding that a psychologist was "not a medical doctor, and [was] not

6

involved in making medical diagnoses or ordering medical studies or tests," and so his testimony about the medical causation of a patient's heart disease went "beyond this witness's expertise in the field of psychology").

Arguing otherwise, Fitzgerald insists that "Dr. Jamison is overwhelmingly qualified to offer causation opinions on the treatments of chronic pain; that chronic pain can lead to self-medicating behavior; and that self-medicating behavior can be harmful." (ECF No. 160 at 6.)  He also argues that *Rimes v. MVT Services, LLC*, 2020 WL 8617211 (N.D. Ok. Aug. 25, 2020) supports his position.[2]  (*Id.* at 4.)

Contrary to Fitzgerald's first assertion, however, Jamison's proffered testimony does not simply connect Fitzgerald's chronic pain to his self-medicating behavior (*i.e.*, his Ketamine use), the fall, and ultimately, the TBI.  It goes several steps further and posits that "the injuries flowing from *the delayed treatment of Mr. Fitzgeralds's compartment syndrome-related injuries to his leg* were a cause of and a contributing factor to his fall and traumatic injury brain injury." (ECF No. 157 at 2 (emphasis added).)  This sort of medical causation testimony goes beyond the subject matter Jamison is qualified to offer.  *See Littlejohn v. Trammell*, 704 F.3d 817, 866 (10th Cir. 2013) (concluding that the expert "could not offer the jury any reliable and persuasive evidence on the question of whether Mr. Littlejohn suffered from an organic brain injury that could adversely affect his behavior" because she was not a psychiatrist "or any

---

[2] The parties' citation to supporting legal authority leaves the Court wanting.  Apart from general Rule 702 and *Daubert* standards, Summit barely cites to legal authority supporting its argument.  (*See generally* ECF No. 157.)  The same goes for Fitzgerald, with the exception of the *Rimes* decision.  (*See generally* ECF No. 160.)  It is not until the reply brief that Summit supplies the Court with caselaw specifically pertinent to the admissibility of Jamison's causation testimony.  (ECF No. 161 at 2, 4–5.)

7

other type of physician, for that matter").

Nor is the Court persuaded that the *Rimes* decision compels a different result. There, the court declined to rule pretrial that a neuropsychologist was unqualified to testify "concerning the cause of a brain injury or lack thereof." 2020 WL 8617211 at *3 (emphasis omitted). Observing that "[m]ost courts . . . conclude if a proper foundation is laid [that] a neuropsychologist may provide causation testimony," the court reasoned that the expert's report suggested that a "proper foundation" may be established to allow him to testify at trial on the cause of the plaintiff's TBI. *Id.*

The circumstances here are different. For one, Jamison is a clinical psychologist, not a neuropsychologist. Fitzgerald does not acknowledge this distinction, let alone explain why Jamison's psychology background situates him the same as a neuropsychologist for the purpose of competently opining on medical causation issues. *See, e.g., Huntoon v. TCI Cablevision of Colorado, Inc.*, 969 P.2d 681, 685 (Colo. 1998) (allowing neuropsychologist to testify that "there was injury to the brain and he identified several areas of the brain where there was continuing impairment"); *Bennett v. Richmond*, 960 N.E.2d 782, 784 (Ind. 2012) (neuropsychologist testified plaintiff "experienced a traumatic brain injury"); *Hutchison v. American Family Mut. Ins. Co.*, 514 N.W.2d 882, 889 (Iowa 1994) (defendant's neuropsychologist testified plaintiff suffered "no traumatic brain injury"); *Dillon v. Auto-Owners Ins. Co.*, 2015 WL 6164059, at *1 (D. Colo. Oct. 21, 2015) (plaintiff's neuropsychologist reported plaintiff suffered "mild traumatic brain injury"). Notably, the Court has managed to locate only one case allowing a psychologist to offer such testimony. *See Draughon v. United States*, 2017 WL 3492313, at *6 (D. Kan. Aug. 15, 2017) (finding clinical psychologist "qualified to

8

render an opinion on the issues of standard of care and causation in this case").

Second, unlike *Rimes*, the Court sees little to no record evidence suggesting that Fitzgerald could lay a proper foundation at trial that Jamison is qualified to testify that the allegedly delayed diagnosis and treatment of Fitzgerald's compartment syndrome led to his TBI.  Jamison's CV makes no mention of experience personally dealing with compartment syndrome, and Jamison confirmed during his deposition that he had merely "heard about compartment syndrome and heard about a lot of accidents and also surgeries and failed surgeries that contributed to complications." (ECF No. 157-2 at 5.)  He added that "we've certainly had people that have been—have had compartment syndrome that have been treated in our practice." (*Id.*)  In other words, Jamison did not claim to have any personal, firsthand experience treating patients with compartment syndrome.  Similarly, with respect to patients suffering from TBIs, Jamison testified that he has "certainly seen them and . . . worked with them," but he also admitted that he "do[es] not see many people with traumatic brain injuries." (*Id.* at 4–5.)

Given all this, the Court concludes that Jamison is not qualified under Rule 702 to testify that Fitzgerald's alleged compartment syndrome caused his TBI.

The Court further concludes that Jamison's methodology for reaching his causation opinion is not reliable.  Jamison prepared two reports following his virtual meetings with Fitzgerald and his parents. (ECF Nos. 157-1, 157-4.)  Therein, Jamison notes—and Fitzgerald emphasizes—that he reached his causation opinion based on Fitzgerald's medical records, his meetings with Fitzgerald, and by reviewing the reports prepared by other experts in this case. (*See* ECF No. 157-1 ("I agree that his current disability and brain injury are related to his compartment syndrome injury.  My

9

understanding is that there are experts who believe that had Mr. Fitzgerald's compartment syndrome been treated earlier, he would not have suffered from the foot drop, neuropathy and constant burning pain that existed before he fell from the building."); *see also* ECF No. 157-2 at 10 (Jamison acknowledging during his deposition that he "relied exclusively on the medical records and past evaluations, and then also the individual—or the interview").)  Such considerations certainly support the notion that Jamison employed a methodology found to be reliable by other courts.  See, e.g., *Etherton v. Owners Ins. Co.*, 35 F. Supp. 3d 1360, 1367 (D. Colo. 2014) (observing that a witness may properly assess specific causation by examining the plaintiff's physical symptoms, medical records, reported medical history, and the applicable medical literature to identify and rule out alternative causes of the plaintiff's injury via a differential analysis).

      Jamison's methodology was nonetheless unreliable, however, because he appears to have failed to expressly conduct a differential analysis before concluding that "the injuries flowing from the delayed treatment of Mr. Fitzgeralds's compartment syndrome-related injuries to his leg were a cause of and a contributing factor to his fall and traumatic [sic] brain injury."  *Taber v. Allied Waste Sys., Inc.*, 642 F. App'x 801, 810 (10th Cir. 2016) ("In evaluating an expert's testimony, district courts may consider whether the expert has 'adequately accounted for obvious alternative explanations.'") (citation omitted).  (ECF No. 157 at 2.)  To reiterate, "[d]ifferential analysis, which is the process of reasoning to the best inference, requires that the expert provide objective reasons for eliminating alternative causes." *Dillon*, 2015 WL 6164059, at *9 (citing *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1237 (10th Cir. 2004)).  "In the medical context,

10

differential diagnosis is a common method of analysis, and federal courts have regularly found it reliable under *Daubert*." *Etherton*, 35 F.Supp.3d at 1371.

Here, Jamison's report does not show that he "eliminat[ed] alternative causes when employing a 'differential analysis.'" *Bitler*, 400 F.3d at 1237 (citation omitted). The report briefly mentions that Fitzgerald used Ketamine on the day of the incident, but it does not attempt to give "objective reasons" for why this was not a potential cause of his fall. (*See* ECF Nos. 157-1 at 2 (simply acknowledging that Fitzgerald "reportedly was intoxicated with ketamine").) Fitzgerald's Ketamine use would seem to be an obvious alternative explanation for why he fell from the third story of the building and sustained the TBI. Accordingly, Jamison was bound to expressly consider and rule out this possibility. *See Taber*, 642 F. App'x at 810 (requiring experts to "exclude those alternative explanations that are 'obvious'—*i.e.*, where there is 'an established connection between certain possible causes and [the injury]'") (citation omitted).

Moreover, courts have said that, if "a defendant identifies a plausible alternative cause, it is 'necessary for the plaintiff's expert to offer a good explanation as to why his or her conclusion remains reliable.'" *Thomson*, 2021 WL 1169708, at *10 (quoting *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 808 (3d Cir.1997))).

Summit posits, and supports with expert testimony, that "the post-[snowboarding] accident injuries are the result of unrelated 'traction' or 'stretch' injury." (ECF No. 157 at 7.) Yet Jamison's report makes no mention of these alternate theories, let alone attempts to refute their potential applicability. (*See generally* ECF Nos. 157-1, 157-4.) Fitzgerald's attempt to brush aside these deficiencies is unavailing. Contrary to his

suggestion, "[t]hat Dr. Jamison did not write down theories advanced by the defense" *is in fact* indication that he did not consider them.  *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 179 (6th Cir. 2009) (requiring experts to "provide a reasonable explanation as to why he or she has concluded that [any alternative cause suggested by the defense] was not the sole cause"); *cf. Rice v. Self*, 2023 WL 6518863, at *15 (N.D. Ga. Feb. 22, 2023) ("More specifically, because Dr. Newfield considered alternative potential causes of Plaintiff's injury and determined that the injury was acute on top of a chronic problem, Dr. Newfield used a reliable differential diagnosis.").  (ECF No. 160 at 10.)

The Tenth Circuit has made clear that "[t]he courtroom is not the place for scientific guesswork."  *Goebel*, 346 F.3d at 1002.  Given the deficiencies outlined above regarding Jamison's causation opinions, the Court is not convinced that he would be able "to reliably defend his conclusion at trial."  *Thomson*, 2021 WL 1169708, at *12.

Consequently, Jamison will not be allowed to opine at trial that the alleged delayed treatment of Fitzgerald's compartment syndrome-related injuries to his leg were a cause of and a contributing factor to his TBI.

### III. CONCLUSION

For the foregoing reasons, the Court GRANTS the Motion.  (ECF No. 157.)

Dated this 18th day of April, 2025.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge